# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Scott A. Milliman, Sr., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No: 11 C 50361 |
| | ) | |
| County of McHenry, et al., | ) | |
| | ) | |
| *Defendants*. | ) | Judge Frederick J. Kapala |

## ORDER

Defendants' motion for summary judgment [218] is granted. Sheriff Prim's Rule 12(c) motion to dismiss [217] is granted in part and stricken in part. This case is closed.

## STATEMENT

  Plaintiff, Scott A. Milliman, Sr., is a former McHenry County Sheriff's Deputy. In 2010, while still working as a deputy, Milliman gave a deposition in a civil case in which he accused the Sheriff, Keith Nygren, of a wide variety of illegal activities including asking plaintiff to push a judge in front of a train. As a result, plaintiff was directed to undergo a fitness-for-duty examination, which he failed. Plaintiff was subsequently terminated for making false accusations concerning Nygren's criminal activity; violating multiple General Orders of the McHenry County Sheriff's Department ("MCSD"), and because he was found unfit for duty. Milliman then sued Nygren and McHenry County, along with a number of Nygren's subordinates, alleging that they violated his First Amendment right to free speech. The case is now before the court on defendants' motion for summary judgment as well as the current Sheriff, William Prim's, motion to dismiss or for summary judgment. For the reasons that follow, the motion for summary judgment is granted and the motion to dismiss or for summary judgment is stricken in part and granted in part.

## I. BACKGROUND

  The facts pertinent to this court's analysis are taken from the pleadings, the defendants' statement of undisputed facts, plaintiff's response thereto and additional statement of facts, and the evidence submitted in support. The facts are undisputed unless otherwise indicated.

  Milliman was hired as a McHenry County sheriff's deputy on March 2, 1998. That same year, Nygren was first elected McHenry County Sheriff. Nygren sought Milliman's assistance with his campaign, and Nygren and Milliman were generally friends. In December 2001, Milliman was diagnosed with brain cancer and underwent brain surgery on July 21, 2002. Following an extended medical leave for recovery, Dr. Christopher Grote, Ph.D., ABPP CN, evaluated Milliman and determined that he was fit for duty, finding him "average to low average" in "overall intellectual

ability," but not otherwise showing signs of inability or psychopathology. Milliman returned to his employment at the MCSD on November 17, 2003.

### A. Milliman's Deposition in the Seipler Case

Seven years later, on November 23, 2010, Milliman testified at a deposition in a case pending before this court brought by former McHenry County Sheriff's Deputy Zane Seipler. See Seipler v. Cundiff, et al., No. 08 C 50257 (N.D. Ill. 2008). Based mostly upon statements to him by Jose Rivera, a friend of Nygren, Milliman testified to widespread corruption and criminality on the part of Nygren, including ticket fixing and bribery, fraudulently procuring Small Business Administration ("SBA") loans, trafficking of illegal aliens, and soliciting the murder of a former judge and an internet blogger.

Specifically, Milliman testified that Jose Rivera told him that Nygren was involved in a bribery scheme beginning in 1999 or 2000 wherein Nygren fixed no valid driver's license tickets for Mexicans. According to Milliman, Rivera told him that an individual ticketed for driving without a valid license would pay a $1,000 bribe, which was split between Rivera and Nygren. Nygren would then contact McHenry County State's Attorney Gary Pack and have the prosecution "nolle prossed." Milliman also testified that Rivera told him that Nygren received $10,000 for assisting a business owner regain his liquor license. Milliman testified further that thereafter Rivera and the business owner also bought more than $5,000 worth of raffle tickets at a 2002 political function for Nygren.

Milliman also claimed that Nygren ran a scheme that involved securing fraudulent SBA loans. Milliman explained that Rivera and Nygren would recruit an undocumented Mexican to fill out an application for an SBA loan, and the proceeds of the loan, less $10,000 for the Mexican, would be split by Rivera and Nygren. The Mexican would then default on the loan and return to Mexico. Rivera told Milliman that he and Nygren sent the Mexicans to someone named "Maria" at Elgin State Bank for the SBA loans, and then later to Home State Bank. Milliman claimed that Rivera and Nygren, attempted to recruit him into the scheme sometime in 2001 or 2002 during a meeting at El Grande Buritto in McHenry, Illinois.

As to trafficking undocumented aliens, Milliman testified that Rivera and Nyrgen attempted to recruit him to participate in a scheme to bring undocumented immigrants into McHenry County from Mexico for a price. According to Milliman, Rivera and Nygren were bringing individuals from Zacatecas, Mexico to Stone Lake Apartment Complex in Woodstock, Illinois and receiving $1,100 a person.

As to solicitation of murder, Milliman testified that he knew of two incidents where Nygren had threatened someone's life. First, in 1999, Nygren asked Milliman to push retired McHenry County Circuit Court Judge Conrad Floeter, who was serving as the campaign manager for Nygren's opponent for Sheriff at the time, in front of a train while Floeter was handing out campaign literature on a train platform. Milliman explained that he and Nygren were also on the platform near a parked train passing out Nygren's campaign literature and as they approached Floeter–who Milliman said was wearing a three-foot tall hat "like the one on Sesame Street"–Nygren leaned over to him and said "push him in front of the train." According to Milliman, he looked at Nygren, said "whatever," and then turned and walked away. Second, Milliman testified that, in 2009, because of comments by a

local internet blogger named David Bachmann made about Nygren, he asked Milliman to "hang" Bachmann and to "make sure, damn it, that it looks like a suicide." According to Milliman, on the next day, Nygren, who seemed like he "was really not himself," told Milliman he would "take care of it himself."

When asked whether he had reported any of Nygren's criminal conduct to law enforcement authorities, Milliman said that he had reported his concerns to the Federal Bureau of Investigation ("FBI") in 2007. Later in his deposition, Milliman explained that there came a point where he could no longer tolerate Nygren's unethical and illegal conduct so he called Patrick Fitzgerald, the United States Attorney for the Northern District of Illinois, and reported Rivera's involvement with Sheriff Nygren. According to Milliman, Fitzgerald said that he was already aware of some situations concerning McHenry County. Fitzgerald asked Milliman if he was willing to sit down and talk with some officials, Milliman agreed to do so, and then Milliman met with two FBI agents.

### B. Events Following Milliman's 2010 Deposition

After Milliman gave his 2010 deposition, Nygren and his subordinate, defendant Undersheriff Andrew Zinke, received copies of the transcript of the deposition. Nygren assigned Zinke to investigate the matter, who in turn assigned the investigation to Commander John Miller, also a defendant in this case. After reading the deposition, Miller concluded that Milliman might have been suffering from what he described as psychological difficulties. Consequently, Miller drafted a memorandum recommending that Milliman be sent for a fitness-for-duty examination. Miller noted that, although Milliman's behavior could be considered a breach of several rules of the MCSD, he recommended that the matter be handled as a possible medical issue rather than a disciplinary one. He also recommended that an independent agency look into the allegations of criminal behavior and that Milliman be placed on administrative leave. Finally, Miller noted that he would do his best to determine what steps the FBI took after it was informed of Milliman's allegations. Neither Zinke nor Miller interviewed Milliman or Nygren. Despite Miller's recommendation that the matter not be handled as a disciplinary one, the investigation file was titled "Termination Review."

Zinke contacted the FBI by a letter dated December 3, 2010, to request clarification about its investigation. Zinke and Miller also discussed the matter with a labor attorney, John Kelly. On December 23, 2010, Zinke placed Milliman on administrative leave and ordered him to attend a fitness-for-duty psychological examination by Dr. Robert Meyers. Milliman objected to Dr. Meyers, as he had been a contributor to Nygren's election campaign and, according to Milliman, had been "used by the McHenry County Sheriff to have other members of [the] department dismissed on specious grounds." Instead, Milliman requested a neutral examiner, and specifically requested Dr. Grote, who had performed his 2003 evaluation. The MCSD acquiesced and ordered Milliman to attend a fitness-for-duty examination by Dr. Grote.

In a January 4, 2011 letter, the FBI responded to Zinke's request as follows:

> We have had the opportunity to carefully review your December 3, 2010, letter requesting reports, if any, of information provided to the FBI by Deputy Sheriff Scott Milliman. I am also aware of the allegations attributed to Deputy Milliman, as well as statements he has made to you and others about contacts he has had with our

3

> office. I can confirm that Deputy Milliman has approached our office in the past and provided information in confidence that he felt may be of interest to the FBI. Where appropriate, investigation was conducted to determine the validity of the allegations. I can tell you that none of the information provided by Deputy Milliman was determined to have prosecutive merit. The Federal Privacy Act prohibits me from relaying the substance of the information provided by Deputy Milliman.
>
> Though the information we can provide at this time is limited, I hope it can be of some use to you.

In documents provided by the FBI during the course of this litigation, the scope of Milliman's reporting to the FBI became much clearer. More specifically, in response to a subpoena in this case, the FBI produced 187 pages of heavily redacted documents reflecting an investigation of the MCSD by the FBI from 2006 to 2009. Milliman brought all of the complaints mentioned in his 2010 testimony and many more to the FBI's attention, all of which the FBI concluded lacked prosecutive merit.

### C. Dr. Grote's Fitness-for-Duty Evaluation & Milliman's Termination

On February 12, 2011, Milliman reported to Dr. Grote's office for his fitness-for-duty evaluation. He was given a battery of tests and scored largely in the same ranges as he did in 2003, with a few ranging higher than he scored in 2003. One exception, however, was a test called the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), in which the results were consistent with "significant feelings and symptoms of paranoia, feelings of being persecuted, disorganized or dysfunctional cognition and emotions, and difficulty working with figures of authority." Dr. Grote explained that "[i]n 2003, he had shown a significant elevation on only one of the critical scales (scale 4); thus his current MMPI-2 profile shows more evidence of psychiatric problems and symptoms than in 2003." In the narrative portion of his report, Dr. Grote wrote that Milliman was:

> extremely disorganized and "derailed", [sic] in [the] interview. He was over-inclusive, tangential and very difficult to follow at certain points in the interview, particularly when he was describing his allegations about corruption in McHenry County. It typically would take over 5 minutes for him to describe a specific allegation, which I would later summarize for him in 30 seconds or less to see if this is what he was alleging.

During his deposition, Dr. Grote agreed that Milliman's feelings of paranoia and persecution resulting from the prospect of potentially losing his job could have contributed to his MMPI-2 score because the test can measure "state versus trait" characteristics. Dr. Grote explained that this means that the test can measure how an individual feels on a particular day rather than measuring a more permanent characteristic. However, Dr. Grote made clear that he did not believe that such feelings explained the whole of Milliman's MMPI-2 test results, but maybe a part of the results.

Dr. Grote also noted that Milliman would "veer from one story to another" and would require "structure" from Dr. Grote, including rephrasing Milliman's statements, in order for Dr. Grote "to understand what [Milliman] was alleging." Milliman also informed Dr. Grote that he worked with the FBI for "about 18 months," although Dr. Grote noted in his report that the number did not match

up to the 3-4 years Milliman's narrative later contained. Milliman related that when he first met with FBI agents at a restaurant they were sitting or standing in such a way that blocked his escape. Milliman said that the FBI agents showed him a photograph of himself with a "drug kinpin" and were trying to implicate him as a co-conspirator. Milliman said his work with the FBI came to an end for two reasons. First, because FBI agents got angry at him for following them while they followed another subject. According to Dr. Grote, Milliman's explanation of how this occurred and his sketch attempting to outline why Milliman was not following the FBI agents was "incomprehensible." The second reason the FBI closed the case, as claimed by Milliman, had something to do with a federal judge being caught on a wiretap engaged in some type of corruption. Milliman told Dr. Grote that he had not told others about this but he could tell Dr. Grote on the condition that Dr. Grote not repeat the information. Dr. Grote told Milliman that he could not agree to that and suggested that they not discuss the allegation any further.

Milliman told Dr. Grote that he once owned three Mexican restaurants in McHenry County as a sideline and it was his plan to quickly franchise this chain of 140 restaurants which would then be sold to Coca Cola. Milliman provided no explanation for the number 140 or the buyer Coca Cola. Milliman claimed that Chipolte had taken his idea for restaurants and he discussed whether he should attempt to exercise his right to collect 4% of the revenues from the current owner of El Grande Burrito. Milliman also told Dr. Grote that the actual purpose of the officer exchange program was for McHenry County to take over Zacatecas, Mexico. Milliman also related to Dr. Grote that he was given an envelope with $3,000 to deliver to a planning or permit official in Belvidere, Illinois, to facilitate approval of a stalled permit application by Rivera to open a business there.

Dr. Grote's report also mentions personal facts shared by Milliman, including that following his brain surgery, he was no longer able to remember virtually anything from his birth in 1961 until 1996. Milliman said he could not remember being in school, any of his marriage, or his children being born and growing up. The only thing he remembers from birth to about 1996 was the 1985 Chicago Bears in the Superbowl. Milliman had not reported memory loss to Dr. Grote in 2003. However, a week or so after the 2011 interview, Milliman called Dr. Grote and claimed that he could, more or less, remember things that had occurred in his life with the exception of 1980-1990. When pressed as to why his account of his memory loss had changed, and why he had not mentioned anything about memory loss in 2003, Milliman said he "wasn't aware of these discrepancies in self-report and didn't know what to make of them."

Milliman denied any psychiatric history, having a problem with alcohol or illicit drugs, and any health problems except the seizures he had before, but not after, his 2002 brain surgery and the chemotherapy and radiation that followed. Milliman told Dr. Grote that he believed that Nygren would soon be indicted because another deputy was still working with the FBI and the IRS and the Illinois State Police are still conducting their own investigations. When Dr. Grote asked Milliman how and why he raised such diverse allegations in a deposition in a case involving racial profiling, Milliman stated that he was under oath and simply answered questions put to him regarding his knowledge of wrongdoing in the Sheriff's Department.

Finally, Dr. Grote's report contains information about interviews Dr. Grote performed of "collaterals" in Milliman's life. Dr. Grote spoke to Miller and noted that his review of Milliman's

5

performance as a deputy was mixed, somewhat complimentary and somewhat not. Miller was unaware of any basis for the allegations Milliman made against Rivera and Nygren. Dr. Grote also noted that Miller informed him that the retirement age for deputies was 50 and that Milliman had disability options. Dr. Grote also spoke with Nygren, who expressed concern about Milliman's previous illness and Milliman's false statements and wanted to know if a medical or psychological condition could explain Milliman's allegations. Nygren indicated that his office would initiate termination proceedings if extenuating circumstances did not exist, "such as a disabling condition," to justify Milliman's actions. Nygren told Dr. Grote that he and Milliman were never best of friends as Milliman had claimed.

Dr. Grote also spoke with Deputy Bodden, an individual whose name he had received from Milliman when he asked for another deputy who would give Milliman's side (or at least a non-management side) of the story. Bodden indicated that he knew of no problems with Milliman's performance as a deputy, but mentioned that his memory could be "goofy" at times. For example, Bodden said Milliman could remember the make and model of a car involved in a crime that occurred five years ago, but could not remember if he was supposed to work the next day. Bodden did not know if any of Milliman's allegations were founded.

Next, Dr. Grote spoke to Milliman's wife, Wendy, who indicated that she witnessed no change in Milliman's behavior after his surgery. She also told Dr. Grote that she had been unaware of Milliman's work with the FBI during several years of its pendency, but related that Milliman once told her that the FBI was following her and the kids to make sure they were safe and that the FBI had offered to put the whole family into the witness relocation program. Wendy generally believed that Nygren was corrupt and should be indicted. In particular, she told Dr. Grote that she believed Nygren was involved in some sort of corrupt behavior with a federal judge. Wendy told Dr. Grote that Milliman's memories were "largely" intact except for the time frame between 1980-1990.

Finally, Dr. Grote spoke to Milliman's attorney, who told Dr. Grote that despite him being Milliman's choice, Milliman was still concerned about the evaluation being an "inquisition." Dr. Grote invited Milliman's attorney to provide any additional information or individuals that would be pertinent to review but he did not provide anyone or anything.

Dr. Grote concluded that "Milliman is judged to now have cognitive and psychological problems that seem to significantly interfere with his ability to effectively work as a deputy sheriff . . . consistent with the effects of his having had a right frontal lobe (insula cortex) brain tumor along with chemotherapy and radiation." Accordingly, Milliman failed the fitness-for-duty examination. Dr. Grote cited five reasons for his conclusion: (1) Milliman's disorganized conversation during the interview consistent with frontal lobe dysfunction; (2) his disorganization and impairment on some of the objective tests consistent with frontal lobe dysfunction; (3) the autobiographical memory loss, not reporting memory loss in 2003, and his shifting account of its extent; (4) abnormal test results on the MMPI-2 test suggestive of significant psychiatric impairment; and (5) issues of poor judgment raised by the uncorroborated allegations which form the basis of this lawsuit and an incident where Milliman was accused of having an affair with a Mrs. Prate and planning her husband's murder while on administrative leave from the MCSD were also consistent with a frontal lobe problem.

6

In comparing the 2011 test results with the 2003 test results, Dr. Grote wrote:

> Comparison to previous neuropsychological testing in 2003 shows him now doing better on nonverbal ability and nonverbal learning and memory. Other cognitive test scores are similar to before. However, the 2003 evaluation did not indicate the disorganization now seen in conversation and on some testing, nor in 2003 was there any reference to claimed loss of autobiographical memories. His MMPI-2 now indicates more problems and symptoms than the one he completed in 2003.

Finally, although Dr. Grote acknowledged that while future developments in the investigation into Milliman's allegations, from other investigations Milliman alleged were ongoing against Nygren, or learning what really happened at the Prate residence, might change some of his interpretations, "new or different information that may come out in the future would not 'undo' the problems seen at present."

In March 2011, after receiving Dr. Grote's report, Nygren and the MCSD encouraged Milliman to submit an application for disability in lieu of termination. Milliman failed to provide the proper forms and thus was not placed on disability. Instead, Milliman filed an EEOC charge in May 2011 claiming that the MCSD discriminated against him in retaliation for his 2010 deposition testimony.

On August 1, 2011, Zinke sent Milliman a letter requiring him to appear at an August 5, 2011 pre-disciplinary hearing. In the letter, Zinke invited Milliman to bring "any files, documentation or other information that would assist you in proving the allegations you made during the deposition you provided on November 23, 2010." At the meeting, Milliman did not bring anything to support his allegations against Nygren, but indicated that he had such information, and so the meeting was continued until August 12, 2011, with a "<u>direct order</u>" that he provide "any and all supporting documentation [Milliman] admitted to possessing, that supports your allegations of criminal activity committed by supervisory members of this department." Thereafter, through contact between Milliman's attorney and the MCSD's labor attorney, Milliman canceled the August 12, 2011 follow-up meeting and stated that he would "allow the Sheriff to proceed based on the information in the Sheriff's possession."

In a letter dated August 17, 2011, signed by Nygren, Milliman was terminated for (1) making false allegations in his November 23, 2010 deposition concerning Nygren's criminal acts; (2) violating multiple General Orders of the Sheriff's Department; and (3) because Dr. Grote found him unfit to perform his duties. Additionally, Nygren determined that plaintiff's continued employment would be detrimental to the efficient operations and interests of the MCSD due to plaintiff's actual and potential disruptiveness.

### D. Dr. Dawkins' Review and Report

During this litigation, Milliman retained Marva P. Dawkins, Ph.D., as an expert to review Dr. Grote's report and findings. Dr. Dawkins has conducted or supervised more than 3,000 fitness-for-duty examinations in her career. She reviewed Dr. Grote's documents and test data and held a two-hour interview with Milliman as part of her review. Dr. Dawkins criticized Dr. Grote's report and conclusion as being too reliant on outside information (that is, information garnered from third

parties) and not sufficiently reliant on the objective tests, which she interprets as being very similar to the 2003 fitness-for-duty examination results. Specifically, she criticized Dr. Grote's indication that Milliman was disorganized and tangential at the interview because "there was no corroboration from the test data nor from collateral sources that this is the way he presented." Next, she criticized Dr. Grote for failing to note how Milliman's disorganization results on some of the objective tests or his autobiographical memory loss correlated to his job responsibilities. She also criticized Dr. Grote for his focus on the MMPI-2 results, which she acknowledged showed abnormalities compared to the 2003 test, but she believed that the results were more likely due to the emotional turmoil of being placed on administrative leave than to any effect of the brain tumor and/or psychiatric impairment. Finally, she criticized Dr. Grote for becoming "bogged down" in determining the truth of the allegations made at the 2010 deposition and incidents since, rather than sticking to the objective findings and the closeness of those findings to the 2003 examination. However, despite her interview with Milliman and review of his medical record, Dr. Dawkins would not opine that Milliman was fit for duty or opine that Dr. Grote's determination was ultimately wrong, instead she focused her criticism on his methodology.

### E. Milliman's 2014 Deposition in this Case

In his deposition in this case, taken in September 2014, Milliman said that he was not maintaining his allegation that Nygren solicited him to murder Judge Floeter. However, Milliman said he was maintaining his allegation that Nygren called him and asked him to hang David Bachmann and to make it look like an accident. Milliman explained that he immediately reported the solicitation to the FBI and they gave him a "wired key fob," which he took with him when he next met with Nygren. When asked what happened when he met with Nygren, Milliman said, "Keith was just awfully nervous. I think he was probably tipped off about it or something or maybe he just was – had second guessing [sic] what he was telling me on the phone. Maybe he had a bad day when he called me, I don't know." When asked if at that meeting Nygren asked him to hang David Bachmann and to make it look like an accident, Milliman said no.

Milliman also noted that the bank originally utilized for the SBA loan scheme, the Elgin State Bank, eventually entered into a consent order with the Federal Deposit Insurance Corporation, which was apparently a result of insolvency. Similarly, the Home State Bank entered into an agreement with the Comptroller of the Currency because of "unsafe and unsound banking practices relating to credit administration and in underwriting and credit risk rating." Milliman testified that one can infer that fraudulent SBA loan activity was occurring at Home State Bank with Rivera and Nygren by the agreement between Home State Bank and the Comptroller. In reference to a subpoena duces tecum that he had issued to Elgin State Bank and Home State Bank for loan documents of Rivera's and Nygren's relatives, associates, and business partners, Milliman remarked, "it's going to show loan fraud. Did you see the documents yet? Just wait."

Milliman testified further that in 2007 he met a man named Piedad Gonzales from Zacatecas, Mexico who drove a truck for Rivera and who said that Rivera helped bring him into the country. Gonzales did not tell Milliman that he gave Rivera $1,100, nor is there any suggestion that Gonzales was present in this country illegally. Milliman also spoke to the manager of Stone Lake Apartment Complex who informed Milliman that the complex was heavily populated with individuals from Zacatecas, Mexico.

8

As proof of the ticket-fixing scheme, Milliman has offered the existence of a number of individuals charged with various offenses whose charges were ultimately dropped or reduced and who also contributed to Nygren's election campaign, often with significant time gaps between payment and the dropping of charges. When asked how he knew those on the list had their cases nolle prossed in exchange for their campaign contributions to Nygren, Milliman responded, "I inferred it," and admitted that he did not speak personally with any individual on the list, nor did he speak with any prosecutor regarding the decisions behind the dismissed tickets.

Milliman also testified that an officer exchange program with Zacatecas, Mexico, was a "scam," apparently designed to benefit individuals living in McHenry County from Zacatecas, Mexico; individuals living in Zacatecas, Mexico; and Rivera and Nygren. Milliman testified that he was present when a fire truck, a public works vehicle, and a squad car were given to Zacatecas government officials at Rivera's home in June 2007 in exchange for an envelope of an undisclosed amount of Mexican currency.

### F. Other Deposition Testimony

During their respective depositions, Rivera and Nygren denied all the illegal conduct of which Milliman accused them. In addition, Nygren testified that, at the time they arose, he told Zinke that Milliman's allegations were untrue. In his deposition, Rivera admitting to knowing an individual named Maria Villearal who worked at Elgin State Bank until she switched jobs and started working at Home State Bank. Rivera's wife, Maggie Rivera, also worked at Home State Bank until 2009 as the Director of Latino Services. Rivera also acknowledged personally receiving loans from Home State Bank significantly in excess of the value of his real estate holdings.

In response to Milliman's subpoena duces tecum, Elgin State Bank advised, "we do not currently, nor did we during the time period indicated in the Subpoena rider, possess any relationship with any of the named parties in the Subpoena rider" and therefore produced no documents. Steve Slack, the president of Home State Bank, testified that he was unaware of any allegations of SBA loan fraud and that the bank lacked possession of any documents which would reflect a loan fraud scheme. Slack explained that the agreement between Home State Bank and the Comptroller came in the wake of the country's financial banking crisis and it addressed all aspects of their banking practices, including business and residential loans, underwriting, credit risks, and capital ratios. While SBA loans would have been included in this comprehensive agreement, the agreement was not about SBA loans or SBA loan fraud. Slack confirmed that an SBA loan is very safe for the bank because, in the event of default, the federal government repays the loan. Slack agreed that it would be possible for individuals to defraud the bank by procuring SBA loans with false documentation, not intending to repay them, then defaulting and disappearing and the bank would not know that a fraud had occurred.

According to Rivera, he started the officer exchange program with private funds in an effort to educate McHenry County law enforcement officers in Mexican culture. Rivera testified that he solicited donations from private individuals in the form of plane tickets purchased for officers to send them to Mexico, and that the program did not have a bank account or accept cash donations. Nygren also testified that he never controlled any money from the program, but admitted to writing thank you letters with specific dollar amounts to various "sponsors" of the program. Nygren testified

9

that at least twenty deputies traveled to Mexico with the program—although he was only able to name a single deputy who had participated —while Rivera put the number closer to six and was unable to name any deputy who participated. Both Nygren and Rivera admitted to traveling to Mexico with the program more than once. None of the other deputies deposed in this case claimed any knowledge of the particulars of the program.

In his third amended complaint, Milliman alleges that defendants retaliated against him for his testimony in violation of the First Amendment pursuant to 42 U.S.C. § 1983 (Count I), interfered with his freedom of association also in violation of the First Amendment pursuant to § 1983 (Count II), civil conspiracy under state law (Count III), and should be indemnified by McHenry County (Count IV). Defendants have moved for summary judgment on all four counts. Plaintiff opposes the motion.

## II. ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating such a motion, the court's role is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Preddie v. Bartholomew Consol. Sch. Corp., 799 F.3d 806, 818-19 (7th Cir. 2015). "A genuine issue exists as to any material fact when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Fidlar Techs v. LPS Real Estate Data Solutions, Inc., 810 F.3d 1075, 1079 (7th Cir. 2016). The court must draw all reasonable inferences in the light most favorable to the party opposing the motion. See Preddie, 779 F.3d at 812-13. "If a party moving for summary judgment has properly supported his motion, the burden shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial." Cincinnati Life Ins. Co. v. Beyrer, 722 F.3d 939, 951 (7th Cir. 2013) (emphasis omitted).

### A. First Amendment Claims (Counts I and II)[1]

"In order to establish a First Amendment retaliation claim, a public employee must show that: (1) [he] engaged in constitutionally protected speech; (2) [he] suffered a deprivation because of [his] employer's action; and (3) [his] protected speech was a but-for cause of the employer's action." Diadenko v. Folino, 741 F.3d 751, 755 (7th Cir. 2013). Defendants contend that Milliman has not advanced sufficient evidence as to elements one and three. Because the court agrees that there is insufficient evidence to satisfy the third element, it need not address the first element.

Assuming without deciding that the accusations Milliman made during his 2010 deposition were protected by the First Amendment, Milliman has the additional burden of identifying evidence that could support a rational trier of fact's conclusion that this speech was a motivating factor in the decision to terminate him and that he would not have been fired anyway for some other reason. Defendants contend that Dr. Grote's determination that Milliman was unfit for duty stands as an

---

[1] In their briefs, the parties do not engage in separate analysis of the free association claim alleged in Count II. Defendants assert in their brief that there is no evidence in the record to support a free association claim but that, in any event, plaintiff's free speech and free association claims are both analyzed under the same standard. Plaintiff did not take issue with this assertion in his response brief.

independent justification for terminating Milliman because they would have terminated him for that reason even if he had not made accusations against Nygren.

The Seventh Circuit has articulated the standard for analyzing causation as follows: "a plaintiff need only show that a violation of his First Amendment rights was a motivating factor of the harm he's complaining of; once he shows that the burden shifts to the defendant to show that the harm would have occurred anyway." Thayer v. Chiczewski, 705 F.3d 237, 251-52 (7th Cir. 2012). "Once a defendant produces evidence that the same decision would have been made in the absence of the protected speech, the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." Id. at 252. "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." Id. As long as the defendant employer honestly believed its reason for the adverse action, summary judgment for defendant is appropriate even if defendant's reason later proves to be foolish, trivial,or even baseless. Lord v. High Voltage Software, Inc., 839 F.3d 556, 564 (7th Cir. 2016).

In this case, there is no question that Milliman's speech during his 2010 deposition was a motivating factor in deciding to terminate his employment as it was expressly listed as a reason in the August 17, 2011 termination letter. It is further undisputed that Milliman was terminated for violating general orders of the Sheriff's department and also, as highlighted by defendants, because of Dr. Grote's determination that he was not fit for duty.[2] The question then becomes whether Milliman has produced evidence from which a rational trier of fact could infer that "the proffered reason [of unfitness for duty] was pretextual and that the real reason was retaliatory animus." Id.

In an effort to meet this burden, Milliman argues that Dr. Grote's conclusions were not independent because defendants deliberately gave the following false, misleading, and irrelevant information to Dr. Grote which influenced his decision:

> (1) when Grote interviewed Miller on February 14, 2011 in connection with his evaluation, Miller told Dr. Grote that there were questions about Milliman's honesty arising out of a class action lawsuit in which Milliman was a plaintiff suing a chemical company which allegedly caused a spike in brain cancer; (2) Miller also told Dr. Grote that the retirement age applicable to Milliman was 50 (Millinam's age at the time) and that there were options for buying back years or going on disability; (3) when Grote interviewed Nygren on February 14, 2011 in connection with his evaluation, Nygren told Dr. Grote that he was "concerned that Milliman made false claims that had no basis, and as such his office could initiate termination proceedings if no extenuating circumstances (such as a disabling condition) could explain the making of these claims;" (4) Miller forwarded an incomplete set of reports to Dr. Grote from the Algonquin Police Department about the Prate incident leaving out the supplemental report indicating that Mr. Prate said his mind was put at ease when he learned that Milliman and his wife were studying a chapter dealing with succession

---

[2] Plaintiff does not argue that defendants failed to satisfy the second step of the analysis by failing to produce evidence that Milliman would have been fired for unfitness even in the absence of his deposition testimony. Instead, plaintiff essentially goes straight to the third step and argues that the unfitness determination was pretextual.

of property upon sudden death; and (5) Miller created a two-page memorandum which he provided to Dr. Grote indicating that as of the date of the memorandum to his knowledge the FBI had not performed an investigation into Milliman's allegations but may have met with him in 2007 and that Milliman worked undercover for the FBI from 2006 to 2009 including wearing a recording device.

With respect to the first item, Milliman's lack of honesty was not one of the reasons Dr. Grote found him to be unfit for duty. Therefore, Milliman has not demonstrated how any misinformation about his honesty with regard to his class-action lawsuit has any significance in connection with Dr. Grote's conclusions.

As to the second and third points, Milliman argues that the message conveyed by Nygren and Miller to Dr. Grote was clear: if you find Milliman fit for duty then he will be terminated, if you find him unfit for duty then he will be able to retire or go on disability. Milliman concludes that because Miller and Nygren delivered the same irrelevant message to Dr. Grote, an inference arises that they were acting in concert hoping to influence Dr. Grote's decision. The court disagrees. These remarks about retirement and disability show indifference to whether Milliman was found unfit, retired, went on disability, or was terminated, not that Miller and Nygren tried to influence a finding of unfitness. In fact, it is undisputed that defendants encouraged Milliman to apply for disability and avoid termination. There is no evidence that Miller or Nygren gave Dr. Grote any false information about Milliman's retirement or disability options or that any allegedly false information they gave to Dr. Grote in any way influenced his decision.

With regard to issues four and five, apparently Milliman is contending that by failing to provide Dr. Grote with the supplemental report on the Prate incident, which indicated that Mr. Prate came to the conclusion that Milliman and his wife were innocently studying, Miller caused Dr. Grote to erroneously conclude that Milliman exercised bad judgment with respect to the incident. Milliman also appears to contend that providing a memorandum about the extent of Miller's knowledge of the FBI's investigation of Milliman's allegations in some way taints Dr. Grote's conclusion. First of all, Milliman has not demonstrated how Miller's indication that to his knowledge the FBI had yet to conduct an investigation was false or misleading. More importantly, Dr. Grote made clear that Milliman's allegations against Nygren and the Prate incident remained under investigation and that the outcome might change some of his interpretations but that any "new or different information that may come out in the future would not 'undo' the problems seen at present." In other words, even if there proved to be some basis for the accusations Milliman made against Nygren, or if the incident at the Prate residence proved to be innocent, Dr. Grote would still find Milliman unfit for duty based on the other four reasons he relied upon. In view of the court's determination that the information provided by defendants to Dr. Grote did not weaken Dr. Grote's evaluation, the court concludes that defendants' actions did not somehow make defendants' reason for firing Milliman pretextual.

The court next takes up Milliman's argument that Dr. Grote's psychological testing of Milliman supports the conclusion that he relied more on the information provided by Nygren and Miller than the test results. In particular, Milliman contends that a comparison of his 2003 scores with his 2011 scores shows little change. According to Milliman, the only tests where there was a meaningful difference in results from 2003 were two sub-tests of the MMPI-2 which Dr. Grote

opined showed "feelings of paranoia and dysfunctional thoughts and emotions, and lack of insight." Milliman, however, highlights Dr. Grote's agreement during his deposition that given Milliman's circumstances–on administrative leave and in jeopardy of being terminated– it would not be unusual for him to feel paranoid and persecuted. Milliman also stresses Dr. Grote's agreement that the test can show how a person was feeling on the particular day he is tested rather than a more permanent long-standing trait.

Milliman mis-characterizes Dr. Grote's thoughts on this subject. Dr. Grote agreed that paranoia and feelings of being persecuted could explain some of Milliman's MMPI-2 score, but not all of it. Nevertheless, what is absent from Milliman's argument is why these circumstances made defendants reliance on Dr. Grote's report unreasonable or disingenuous, thereby indicating that it was a pretext for retaliation in violation of the First Amendment. Dr. Grote's acknowledgment of another possible partial explanation for Milliman's MMPI-2 test results apart from frontal lobe dysfunction does not show that defendants' reliance on his opinion that Milliman had such a dysfunction was unreasonable. This is especially so in light of the other reasons supporting a finding of unfitness.

Milliman also relies on Dr. Dawkins' criticisms of Dr. Grote's methodology in arriving at his conclusion that Milliman was unfit for duty as a sheriff's deputy. However, Dr. Dawkins' criticisms of Dr. Grote's analysis, even accepted at face value, do not establish that defendants were unreasonable or disingenuous in accepting Dr. Grote's conclusion that Milliman was unfit for duty. Initially, it is important to remember that Dr. Dawkins' criticisms were not available to defendants when they decided to terminate Milliman and, consequently, there is no evidence that they knew of the purported shortcomings in Dr. Grote's report. Instead, defendants had the report of a mental health professional of Milliman's choosing indicating that he was not fit for duty. Nevertheless, Dawkins does not explain why Dr. Grote's observation that Milliman was disorganized, tangential, and derailed during the interview required corroboration from a collateral source or what an acceptable collateral source would be. Also, just because there may be another reasonable explanation for Milliman's MMPI-2 test results apart from frontal lobe dysfunction does not demonstrate that defendants' reliance on Dr. Grote's explanation of those results was unreasonable or disingenuous. It is significant that while Dr. Dawkins offers criticism of Dr. Grote's methodology in arriving at his opinion that Milliman was unfit for duty, she does not offer the contrary opinion that Milliman was fit for duty. See Lewis v. Henderson, 249 F. Supp. 2d 958, 973 (N.D. Ill. 2003) (finding that plaintiff could not establish a claim for retaliation where plaintiff did not even argue that physician's diagnosis that plaintiff was unfit for duty was erroneous and therefore a pretext for retaliation).[3] Dr. Dawkins also criticized Dr. Grote for failing to explain how disorganization of

---

[3]Having received Dr. Grote's report finding Milliman unfit for duty, MCSD had no choice but to take him off the street. MCSD could not assume the liability that would follow for maintaining the employment of a deputy that had been found unfit for duty. Under the circumstances of this case, MCSD could not be expected to authorize Milliman to wear a uniform and carry a firearm and then send him out into the community invested with the power and authority of a law enforcement officer with the attending potential for abuse. When Milliman refused to pursue disability, MCSD was left with no choice but to terminate his employment. That choice, it seems, was later validated when, after more than six years of litigation before this court Milliman has been unable to garner an expert who will opine that he was fit for duty.

13

thought and memory loss correlate to a deputy's job responsibilities. However, considering that law enforcement officers are called upon to observe and evaluate facts and later relate those facts in police reports and through testimony, this correlation is self-evident. Finally, based on Dr. Grote making clear that whether or not Milliman's accusations against Nygren proved true he would still find Milliman unfit for duty based on his other four reasons, there is little to support Dr. Dawkin's criticism that Dr. Grote became "bogged down" in determining the truth or fallacy of the accusations Milliman made in his 2010 deposition. As a result, this criticism constitutes no evidence that defendants' termination of Milliman based on unfitness for duty was pretextual.

Based on the foregoing, the court finds that Milliman has not produced sufficient evidence to support an inference by a rational trier of fact that Milliman's termination for unfitness was pretextual and that the real reason was retaliatory animus.[4] Therefore, the court finds that even if Milliman's 2010 deposition testimony was protected, Milliman has failed to advance evidence to support the causation element of his First Amendment retaliation claims. Consequently, defendants are entitled to summary judgment on Counts I and II.

### B. Civil Conspiracy and Indemnification (Counts III & IV)

In Count III, Milliman alleges civil conspiracy under state law. Specifically, that defendants "intentionally worked together for the common plan and purpose of harming the plaintiff as described [in Counts I and II]." Because this state-law claim is derivative of Milliman's federal claims contained in Counts I and II and for which there is insufficient evidence, this court will retain its supplemental jurisdiction and grant defendants summary judgment on Count III for the same reasons it granted defendants summary judgment on Counts I and II. See Williams v. Rodriguez, 509 F.3d 392, 404 (7th Cir. 2007) (noting that there is an exception to the general rule of relinquishing jurisdiction over state-law claims after all federal claims have been dismissed where substantial judicial resources have already been expended on the state claims and when it is clearly apparent how the state claim is to be decided).

In Count IV, Milliman proceeds against McHenry County under 745 ILCS 10/9-102, which provides for indemnification by a "local public entity" for tort judgments incurred by employees acting within the scope of their employment. Accordingly, Count IV is premised on Milliman recovering damages on Counts I, II, or III. However, because this court has determined that Milliman has failed to present sufficient evidence to support these claims, no judgment in favor of Milliman on those claims will be reached in this court. Milliman agrees that if none of the defendants are found liable McHenry County's duty to indemnify is extinguished. Consequently, McHenry County is granted summary judgment on Count IV.

Lastly, on December 3, 2014, Sheriff William Prim was substituted under Federal Rule of Civil Procedure 25(d) as a defendant in his official capacity as Nygren's successor as McHenry County Sheriff. Prim moves to dismiss any official capacity claim pending against him as

---

[4] Having concluded that Counts I and II fail due to a lack of evidence to support the third element of a First Amendment retaliation claim, the court need not reach defendants' alternative arguments that defendants Zinke, Miller, Neilsen and Schmitt were not decision makers, the individual defendants are entitled to qualified immunity, and why Milliman's Monell claims fail.

insufficiently pleaded and, in the alternative, moves for summary judgment. Milliman has objected to the motion to dismiss as procedurally out of order because it was filed beyond the deadline for filing dispositive motions. Milliman has no objection, however, to Prim joining in the motion for summary judgment filed by the other defendants. Consequently, Prim's motion is stricken inasmuch as it seeks dismissal of claims, but summary judgment is granted in his favor along with all the other defendants.

### III. CONCLUSION

For all the reasons stated above, defendants have shown, on the basis of the record evidence, that no genuine issues of material fact exist that would warrant a trial in this case. See Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."). Thus, defendants' motion for summary judgment is granted. This case is closed.

Date: 8/4/2017

ENTER:

_____
FREDERICK J. KAPALA

District Judge